**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| MASSEY COAL SALES COMPANY, INC., | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 3:06CV246-HEH |
| ONTARIO POWER GENERATION INC., | ) |
| Defendant. | ) |
| ONTARIO POWER GENERATION INC., | ) |
| Counterclaimant, | ) |
| v. | ) |
| MASSEY COAL SALES COMPANY, INC. and MASSEY ENERGY COMPANY, | ) |
| Counterclaim Defendants. | ) |

**MEMORANDUM OPINION**
**(Denying the Parties' Motions for Summary Judgment)**

This is a contract dispute involving the purchase and sale of coal. It is currently before the Court on motions for summary judgment filed by each of the parties. Both parties have filed memoranda of law in support of their respective positions. The Court will dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the Court, and argument would not aid in the decisional process. Finding material issues in dispute, the Court will deny the parties' motions.

## I. Background

Ontario Power Generation Inc. ("OPG") and Massey Coal Sales Company, Inc.

("Massey") entered into an installment sales contract (the "Agreement") in which Massey agreed to sell and OPG agreed to buy 625,000 tons of coal during the term of the Agreement, namely from March 4, 2004 until December 31, 2004 (the "Term"). Massey subsequently brought its Complaint, claiming that OPG breached the Agreement by withholding payment of $357,344.50 for the final load of coal delivered to OPG and seeking to recover that amount. OPG denies those claims, and instead, in its Counterclaim, asserts that Massey breached the Agreement by delivering only 470,274 tons of the 625,000 tons required by the Agreement and seeks damages in the amount required to cover the undelivered coal, less the amount already withheld.[1]

The Agreement replaces an earlier contract in effect since 1996 and by its terms is governed under the laws of the State of New York. (Agreement § 17.6.) It sets forth the obligations of Massey as the seller and OPG as the buyer of 625,000 tons of low-sulphur bituminous coal at a base price of $33.50 US per ton f.o.b. railcar. *Id.* § 1. Massey operated thirteen mines ("loading facilities") comprising the source of coal to be delivered pursuant to the Agreement. *Id.* § 2.1, sched. A. OPG contracted with Norfolk Southern Railway Company ("Norfolk Southern") and CSX Transportation, Inc. and Bessemer and Lake Erie Railroad Company ("CSX") to provide rail transport from the loading facilities to destination ports located on Lake Erie. (Counterclaim ¶ 61, Agreement § 4.3.1.)

Under the Agreement, Massey was responsible for loading the coal into rails cars ("Unit Trains") at the loading facility. (Agreement § 4.1.) On or before the 15th day of each calendar

---

[1] In its counterclaim, OPG also named Massey Energy Company ("Massey Energy") as a Counterclaim Defendant. Massey Energy, the corporate parent of Massey, executed an agreement in conjunction with the Agreement guaranteeing payment of Massey's debts, liabilities, and obligations to OPG.

month, OPG was responsible for advising Massey of (1) the volume of coal that OPG desired for the following month (the "Monthly Nominated Amount"), (2) the port to which the coal will be shipped, and (3) an estimate of the tonnage for the next succeeding month. *Id.* § 4.3.1. Massey was then obligated to advise OPG on or before the 25th day of the same month of the Delivery Schedule, which included Massey's desired loading dates and quantities at each loading facility. *Id.* OPG then had five calendar days from the date of receipt to deliver notice of any objections to the Delivery Schedule submitted by Massey. *Id.* § 4.3.3.

The Agreement further provided that the Unit Trains would be scheduled by Massey and coordinated with OPG in accordance with the Delivery Schedule. *See id.* § 8.1. If either party objected to or requested a change to the Delivery Schedule, the Agreement requires them to "work together in good faith to agree on a reasonable and mutually acceptable amended Delivery Schedule." *See id.* § 4.3.4. OPG was responsible for the transportation of the coal from the loading facility to the ultimate destination, which included "arrang[ing] for Unit Trains compatible with the rail and loading facilities" and ensuring that "adequate rail transportation equipment" was available to accept deliveries from Massey. *Id.* §§ 4.3.6, 8.1.

In the event Massey failed to deliver or OPG failed to accept delivery of the Monthly Nominated Amount within the relevant month (in either case, a "Deliverly Default"), Section 11 of the Agreement sets forth the exclusive remedies available to the party not in default. *Id.* § 4.3.7. Section 11 distinguishes between, and thus provides different remedies for, a Delivery Default resulting from a Transportation Failure and a Delivery Default other than one resulting from a Transportation Failure. *See id.* §§ 11.1.1–.2.

According to the Agreement, a Transportation Failure includes Massey failing to provide

OPG with appropriate trackage or access to Massey's loading facilities, or OPG failing to ensure that adequate rail transportation equipment is available to accept deliveries. *Id.* § 11.1.1. In the event of such a Delivery Default, the non-defaulting party may either

> (a) re-schedule delivery or receipt, as the case may be, of the deficiency resulting from such Delivery Default in approximately rateable amounts during the longer of (i) the remainder of the Term or (ii) a period of ninety (90) days, or (b) reduce the tonnage quantity [of 625,000 tons] by the amount of such deficiency and require the Defaulting Party to pay "cover" in the amount determined in accordance with Section 11.1.3 or 11.1.4, as applicable.

*Id.* § 11.1.1. In the event of a Delivery Default other than one resulting from a Transportation failure, the non-defaulting party's sole remedy shall be

> to re-schedule delivery or receipt, as the case may be, of the deficiency resulting from such Delivery Default in approximately ratable amounts during the longer of (i) the remainder of the Term or (ii) a period of ninety (90) days, in either case beginning on the first day of the month following such Delivery Default; provided however, that in the event such deficiency, determined with respect to each Delivery Default separately, is greater than twenty thousand tons (the amount in excess of twenty thousand tons being the "excess deficiency"), the Non-Defaulting Party may elect to reduce the tonnage quantity [of 625,000 tons] by the amount of the excess deficiency, rather than re-schedule, and require the Defaulting Party to pay "cover" for the excess deficiency in the amount determined in accordance with Section 11.1.3 or 11.1.4, as applicable.

*Id.* § 11.1.2. The Agreement also obligated both parties to mitigate any damages and made neither party liable for any punitive, special, incidental, or consequential damages arising out of the Agreement. *Id.* §§ 11.1.5, 11.2.

During the term of the Agreement, Massey coal delivered approximately 370,000 tons of coal to OPG, 255,000 tons less than the 625,000 tons set forth in the Agreement. In early 2005,

Massey accepted responsibility for 100,000 tons of the shortfall and delivered that amount to OPG. In contemplation of the damages resulting from the remaining shortfall of approximately 155,000 tons, OPG withheld the $357,344.50 due to Massey for the final coal delivery made to OPG.

On April 11, 2006, Massey filed its Complaint, claiming that OPG breached the Agreement when it failed to pay for the delivered coal and seeking damages in the amount of $357,344.50 plus interest. Massey argues that OPG regularly failed to provide adequate transportation for delivery of the coal during the term of the Agreement, and the total number of tons affected by OPG's failure totaled approximately 155,000 tons. (Compl. ¶¶ 14–16.) Therefore, Massey believes that it justifiably, under Section 11.1.1 of the Agreement, reduced its total deliverable tonnage by that amount. (Compl. ¶ 17.)

On May 15, 2006, OPG filed its Answer and Counterclaim. OPG admits that it withheld the $357,344.50, however, OPG claims that Massey breached the Agreement by failing to tender delivery of the full amount of coal—625,000 tons—required by the agreement and refusing to pay OPG cover. (Answer ¶ 19.) OPG argues that Massey scheduled an inadequate number of trains each month to satisfy the Monthly Nominated Amount of coal, and therefore Massey cannot now argue that OPG failed to accept coal that was not tendered in the first place. Thus, according to OPG, it has legitimately exercised its right to withhold the $357,344.50, and is further due $4,838,690.38, which equals the amount required to cover the undelivered 155,000 tons of coal less the amount already withheld.

## II. Standard of Review

Rule 56 provides that judgment "shall be rendered . . . if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The facts and inferences to be drawn from the facts must be viewed in the light most favorable to the non-moving party, and this party is entitled to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to him." *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990) (alteration in original) (internal quotations omitted). The nonmoving party may not rest upon "mere allegations or denials," but instead "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

**III. Analysis**

"The fundamental rule in the construction of all agreements is to ascertain the substantial intent of the parties." *M. O'Neil Supply Co. v. Petroleum Heat & Power Co.*, 280 N.Y. 50, 55, 19 N.E.2d 676, 679 (1939). While the interpretation of a written contract is ordinarily for the court alone, the contract's construction is for the jury when its meaning is ambiguous. *Id.* at 56, 19 N.E.2d at 679. In other words, when the intent of the parties must be determined by evidence outside of the written instrument, a question of fact is presented for the jury to resolve. *Ashland Mgmt. Inc. v. Janien*, 82 N.Y.2d 395, 401–02, 624 N.E.2d 1007, 1009 (1993). With these principles in mind, the Court will discern, where possible, the obligations of the parties under the Agreement and whether those obligations were met as a matter of law.

The parties do not dispute that Massey was obligated to supply the coal, schedule the rail

cars, and load coal onto rail cars at its loading facilities, and OPG was obligated to ensure adequate rail transportation equipment was available to accept delivery of the coal and provide rail transportation from the loading facilities to the destination ports. (Agreement §§ 2.1, 4.1, 4.3.6, 8.1.) At issue is (1) whether Massey fulfilled its obligation under the Agreement to schedule the trains and (2) whether OPG fulfilled its obligation to ensure that adequate rail transportation equipment was available to accept the coal deliveries. *Id.* §§ 4.3.6, 8.1. The Court will address each issue in turn.

Section 8.1 of the Agreement provides that "Unit Trains will be scheduled by [Massey] and coordinated with [OPG] in accordance with the Delivery Schedule." (Agreement § 8.1.) With respect to the Delivery Schedule, on or before the 15th day of each calendar month, OPG was responsible for advising Massey of (1) the volume of coal that OPG desired for the following month (the "Monthly Nominated Amount"), (2) the port to which the coal will be shipped, and (3) an estimate of the tonnage for the next succeeding month. *Id.* § 4.3.1. Massey was then obligated to advise OPG on or before the 25th day of the same month of the Delivery Schedule, which included Massey's desired loading dates and quantities at each loading facility. *Id.* OPG then had five calendar days from the date of receipt to deliver notice of any objections to the Delivery Schedule submitted by Massey. *Id.* § 4.3.3.

The parties agree that forty-four separate loadings were necessary to have shipped the 625,000 tons required by the Agreement. (Massey Mem. in Supp. 19, OPG Mem. in Supp. 10.) OPG argues that because Massey obtained only twenty-six rail permits, eighteen short of the forty-four needed, it failed to schedule a sufficient number of trains to satisfy the 625,000-ton requirement. This argument, however, does not account for evidence indicating that permits

were reused on later dates due in part to the unavailability of adequate rail transportation. (Massey Mem. in Supp. App. J.) Massey presents evidence that coal was available for delivery on eighteen occasions where the rail permit had to be rescheduled for later dates because adequate rail transportation was unavailable. (Massey Mem. in Supp. App. J.)

Nonetheless, evidence does suggest that Massey "did not schedule to [OPG's monthly] nomination," but rather scheduled at least in part based on Massey's production inventory sales schedule. (Mohr Dep. 24:21–31:18.) Further, Massey admits that in certain months, it "was unable, for various reasons including some attributable to OPG, to provide OPG with the Delivery Schedule on or before the 25th day of each calendar month." (Reply 10.) The Court therefore finds that material issues of fact are in dispute regarding whether Massey properly scheduled a sufficient number of trains in accordance with its obligations under the Agreement.[2]

The next question is whether OPG fulfilled its obligation to ensure that adequate rail transportation equipment was available to accept the coal deliveries. Although OPG insists that it provided adequate rail transportation because transportation was eventually provided for each rail permit, Massey presents evidence that delivery defaults occurred due to adequate rail transportation being unavailable. (*See* Massey Mem. in Supp. 8–10.) Under Section 4.3.7 of the Agreement, a delivery default occurs when Massey fails to deliver or OPG fails to accept delivery of the Monthly Nominated Amount within the relevant month. (Agreement § 4.3.7.) Thus, Section 4.3.7 contradicts OPG's interpretation that delayed availability of transportation

---

[2] The Court also notes that the parties dispute whether, under Section 4.3.3 of the Agreement, OPG properly delivered notice of its objection to each of the Delivery Schedules proposed by Massey. (Massey Mem. in Supp. ¶ 17, OPG Mem. in Opp. 7.) OPG does provide evidence that more than two objections were made. (OPG Mem. in Opp. Ex. 19, 52:19-53:16, Ex. 25.)

beyond the relevant month was "adequate" under the Agreement.

Therefore, this Court finds that genuine issues of material fact exist as to whether the parties met their respective obligations under the Agreement, making it inappropriate to grant a motion for summary judgment in this case.

**IV. Conclusion**

For the reasons stated above, the party's motions will be denied.

An appropriate Order will accompany this Memorandum Opinion.

/s/
Henry E. Hudson
United States District Judge

ENTERED this 8th day of November.
Richmond, VA